**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

|  |  |
|---|---|
| **RONALD SHAFFER,** *Plaintiff,* )<br>)<br>) | |
| v. )<br>)<br>) | Cause No. 5:17-CV-415-RCL |
| **GREEN EARTH TECHNOLOGIES, INC.,** *Defendant.* )<br>)<br>)<br>) | |

## MEMORANDUM OPINION

Ronald Shaffer was employed by Green Earth Technologies, Inc. (GET) from 2008 until he and all other GET employees were terminated on May 15, 2015. Following his termination, Shaffer sued GET for breach of contract and fraud. In 2018, Judge Xavier Rodriguez granted summary judgment to Shaffer on his breach of contract claim. This left the issues of damages and Shaffer's fraud claims for trial. This Court held a one-day bench trial on these remaining issues. The Court will award Shaffer damages on his breach of contract claim plus prejudgment interest and post-judgment interest on these amounts. The Court will not award Shaffer severance pay or money for his unused vacation time. Finally, the Court will deny Shaffer's fraud claims. This means Shaffer is not entitled to recover attorney's fees.

### I.  Background

Shaffer signed two employment contracts in 2008. On January 17, 2008, Shaffer signed the first employment agreement, which named him "Vice President Operation/Global Supply Chain." On July 17, 2008, Shaffer signed the second employment agreement, which named him "Vice President of Operation and Logistics." Both agreements contained an integration and choice-of-law clause, which stated Connecticut law controls for the purposes of interpreting the contract.

Shaffer agreed on multiple occasions to have his pay reduced because GET had cash flow difficulties. Shaffer was not paid his full bonus in 2008 and was paid less than his full salary in 2009–2015. On May 15, 2015, Shaffer and all other GET employees were terminated. He then filed his original petition on May 6, 2016 in the 166th Judicial District Court of Bexar County, Texas, bringing several claims related to his employment agreement with GET and alleged misrepresentations made by GET. ECF No. 1-1. Shaffer alleged GET breached the employment agreement by failing to pay his full salary, unpaid but earned vacation days, and severance pay. GET removed to federal Court on May 10, 2017. ECF No. 1. On October 4, 2018, Judge Xavier Rodriguez, who initially presided over this case, granted summary judgment to Shaffer on his breach of contract claim. In this opinion, Judge Rodriguez determined the July 17, 2008 agreement entirely superseded the January 17, 2008 agreement, as it was "complete on its face, contain[ed] a full integration clause, and its validity is not disputed by either party." Order 11, ECF No. 55. This left the amount of damages Shaffer suffered as a result of the breach of contract and Shaffer's fraud claims as the only issues remaining for trial. The matter was transferred to Judge Lamberth on November 6, 2018, and a bench trial was held on March 23, 2019.

II.    **Discussion**

   A.    <u>Shaffer is entitled to payments to fulfill the 2008 bonus and to account for his reduced salary in 2009–2015</u>

The July 17, 2008 employment agreement set Shaffer's salary at $150,000 per year. Pl.'s Ex. 5. The agreement also provided that "[i]f during calendar year 2008, shipments in any one calendar month unit sales exceed the threshold of one million units in one calendar month you will be receive [sic] a one time cash bonus equal to 50% of your annual salary ($75,000) payable." *Id.*

Shaffer was paid his entire salary of $150,000 in 2008, but did not receive the entire bonus even though the sales goal was met. *See* Pl.'s Ex. 52; Pl.'s Proposed Findings of Fact &

2

Conclusions of Law, ECF No. 66 [hereinafter ECF No. 66]; Def.'s Proposed Findings of Fact & Conclusions of Law, ECF No. 67-1 [hereinafter ECF No. 67-1]. Shaffer only received $25,000 of the one time $75,000 bonus in 2008. ECF No. 66; ECF No. 67-1. GET concedes in its proposed findings of fact and conclusions of law that Shaffer is entitled to the remaining $50,000 of the 2008 bonus. ECF No. 67-1.

Further, Shaffer agreed to temporarily defer compensation on multiple occasions. He participated in three salary reduction programs in which he received stock in exchange for temporarily forfeiting his compensation. The first salary reduction program began on July 17, 2013; the second salary reduction program began on January 2, 2014; and the third salary reduction program began on May 14, 2014. Pl.'s Ex 30. Overall, Shaffer was paid less than his full salary in 2009–2015. Shaffer was only paid $135,311.80 of his $150,000 salary in 2009, $121,170.02 of his $150,000 salary in 2010, $140,000 of his $150,000 salary in 2011, $147,115.37 of his $150,000 salary in 2012, $142,788.43 of his $150,000 salary in 2013, and $60,000 of his $150,000 salary in 2014. Pl.'s Ex. 8; ECF No. 66; ECF No. 67-1; Trial Tr. 92–95.[1] For 2015, Shaffer was paid $27,500 prior to his termination in May, whereas Shaffer's salary for five months work calculated on a pro rata basis should have been $62,500. ECF No. 66; ECF No. 67-1; Trial Tr. 90–91.[2]

The parties agree Shaffer is entitled to receive his full compensation for these years. Therefore, Shaffer is entitled to recover $14,688.20 as unpaid compensation for 2009, $28,829.98

---

[1] Shaffer's complete 2014 income was not included in plaintiff's exhibit 8, which consisted of his W-2 forms for 2009–2014. Shaffer's 2014 W-2 showed he earned only $8,653.84, but Shaffer testified he was also paid as a consultant by GET in 2014 and this income did not show up on his W-2 form. He testified he was paid $60,000 in total in 2014 and GET implicitly concedes this is accurate by stating in its proposed conclusions of law: "For 2014, Shaffer alleges he was paid $60,000 of his $150,000 salary, so he is entitled to recover $90,000 for unpaid compensation for 2014." ECF No. 67-1.

[2] Shaffer testified he was paid $27,500 prior to his termination in May 2015. Trial Tr. 90–91. GET implicitly concedes this is accurate by stating in its proposed conclusions of law: "For 2015, Shaffer alleges he was paid $27,500 prior to his termination in May. Calculating his salary owed for five months' work on pro rata basis Shaffer is entitled to recover $35,000." ECF No. 67-1.

as unpaid compensation for 2010, $10,000 as unpaid compensation for 2011, $2,884.63 as unpaid compensation for 2012, $7,211.57 as unpaid compensation for 2013, $90,000 as unpaid compensation for 2014, and $35,000 as unpaid compensation for 2015.

B.    Shaffer is not entitled to severance pay

The July 17, 2008 employment agreement does not contain any language regarding severance pay. This silence is extremely significant as the July agreement contains a clause that "[t]his is the complete agreement and cannot be modified unless reduced to writing and signed by you and the Company." Pl.'s Ex. 5. Shaffer did not present any evidence the July agreement was modified to incorporate a severance clause.

The July contract's silence as to severance pay stands in stark contrast to the severance clause in the January 17, 2008 agreement. The January 17, 2008 agreement contained a provision that "[i]n the event that the Company elects to no longer require your services you will continue to receive your salary for six months but will not receive additional vesting shares, bonus or other employee benefits. You will not be [sic] receive any continued salary in the events that you are terminated for cause or either resign from the Company." Pl.'s Ex. 6. The July agreement entirely superseded the January agreement, and omitted this provision. Because the July agreement does not say anything about severance pay, is a complete agreement, and contains an integration clause, evidence of the existence of a severance clause in the January agreement cannot be used to vary the July contract. See *Alstom Power, Inc. v. Balcke-Durr, Inc.*, 269 Conn. 599, 609–10 (Conn. 2004). Thus, Shaffer is not entitled to any severance pay.

C.    Shaffer is not entitled to payment for his unused vacation time

Shaffer alleges he is entitled to payment for twenty weeks of earned vacation accrued during his employment with GET in the amount of $57,692.40. However, the July 17, 2008

4

employment agreement does not contain any language regarding pay for unused vacation time and GET did not have a policy to compensate employees for unused vacation time upon termination.

The July contract solely stated Shaffer "will be entitled to three (3) weeks paid vacation earned on a pro rata basis over the course of the year." Pl.'s Ex. 5. This contract term does not entitle Shaffer to receive any payment for accrued benefits upon termination. Further, the July agreement contained an integration clause that "[t]his is the complete agreement and cannot be modified unless reduced to writing and signed by you and the Company." *Id.* Accordingly, the employment contract does not entitle Shaffer to any payment for his unused vacation time.

Connecticut law entitles employees to compensation for accrued benefits upon termination if an employer policy provides for such a payment. Connecticut law states:

> If an employer policy or collective bargaining agreement provides for the payment of accrued fringe benefits upon termination, including but not limited to paid vacations, holidays, sick days and earned leave, and an employee is terminated without having received such accrued fringe benefits, such employee shall be compensated for such accrued fringe benefits exclusive of normal pension benefits in the form of wages in accordance with such agreement or policy . . . .

Conn. Gen. Stat. § 31-76k (2019). But Shaffer does not fall within this statute. He only contends he had a verbal understanding with GET that vacation benefits were accrued on an annual basis and an employee would be compensated for unused vacation time at the time the employee left the company. Trial Tr. 73, 100. Shaffer readily acknowledges this was never committed to writing and GET never had a policy regarding vacation benefits beyond what was written in the July employment agreement. Trial Tr. 100. During the trial, defense counsel cross-examined Shaffer about GET's lack of policy to pay employees for accrued benefits upon termination:

> Q [Defense Counsel]. No written employment policies or procedures [at GET]?
> A [Shaffer]. Not that I ever saw.
> Q [Defense Counsel]. Did you ever see a vacation policy?
> A [Shaffer]. Just what was in the offer.
> Q [Defense Counsel]. Only [what was] written in the offer is what you have?

A [Shaffer]. Right and the understanding was that any time you [accrued] that on an annual basis. If you didn't use it, it would be compensated at the time you left the company.

Q [Defense Counsel]. There is no understanding like that in writing, is there?

A [Shaffer]. That's correct, that was verbal.

*Id.* Thus, GET did not have a policy providing for the payment of accrued benefits at termination. And an alleged verbal agreement that was never reduced to writing and signed by Shaffer and GET cannot modify the July employment contract. Therefore, Shaffer is not entitled to payment for his unused vacation time.

D. <u>Shaffer did not establish GET committed fraud in securing his participation in the salary reduction programs</u>

Shaffer alleges GET committed fraud in securing his participation in the salary reduction programs. Connecticut courts have defined fraud as "deceit, deception, artifice, or trickery operating prejudicially on the rights of another, and so intended by inducing him to part with property or surrender some legal right. . . . Anything calculated to deceive another to his prejudice and accomplishing the purpose, whether it be an act, a word, silence, the suppression of the truth, or other device contrary to the plain rules of common honesty." *Spears v. Elder*, 124 Conn. App. 280, 287 (Conn. App. Ct. 2010). "Under the common law . . . it is well settled that the essential elements of fraud are: (1) a false representation was made as a statement of fact; (2) it was untrue and known to be untrue by the party making it; (3) it was made to induce the other party to act upon it; and (4) the other party did so act upon that false representation to his injury." *Id.* Shaffer failed to establish GET committed fraud in securing his participation in the salary reduction programs.

1. *GET did not commit fraud in inducing Shaffer to participate in the first salary reduction program*

First, Shaffer contends GET committed fraud in inducing him to participate in the first salary reduction program. The first salary reduction program began on July 17, 2013. Shaffer alleges:

> GET's false representations include the representation that the salary reduction associated with Salary Reduction Program No. 1 was temporary. GET further made false representations that salary reductions would be paid to employees from payments by PDVSA [Petróleos de Venezuela, S.A.] although no orders had been received from or secured from PDVSA at the time of Salary Reduction Program No. 1. GET failed to disclose to SHAFFER the financial condition of GET or the TTi [Techtronic Industries North America, Inc.] Litigation prior to SHAFFER's participation in Salary Reduction Program No. 1. Each of the foregoing representations and/or omissions of fact were untrue, known to be untrue by GET, made by GET to induce SHAFFER into participating in Salary Reduction Program No. 1, and SHAFFER did act upon such representations by participating in Salary Reduction Program No. 1.

ECF No. 66. Shaffer argues he was injured by participating in the salary reduction program because he did not receive his full compensation during this period.

GET disputes Shaffer established fraud's fourth element. GET claims Shaffer did not suffer any injury because he never lost his right to obtain full compensation. This argument cannot stand. Although Shaffer may not have ever lost the legal right to obtain his full compensation, he was not actually paid this money during the year he earned his salary. Shaffer suffered an injury the instant he was not paid in full. Unfortunately for Shaffer, though, he fails to establish other elements of fraud.

The party claiming fraud has the burden of proof. *Weinstein v. Weinstein*, 275 Conn. 671, 684 (Conn. 2005). And the party asserting the fraud claim "must prove the existence of the first three of [the] elements by a standard higher than the usual fair preponderance of the evidence, which ... [the Appellate Court of Connecticut] ha[s] described as clear and satisfactory or clear, precise and unequivocal." *Duplissie v. Devino*, 96 Conn. App. 673, 681 (Conn. App. Ct. 2006).

Shaffer did not meet his burden on any of his fraud allegations regarding the first salary reduction program.

Shaffer did not establish GET had the present intention not to pay Shaffer his full salary once the company's financial health improved. "A representation about a promise to do something in the future, when linked with a present intention not to do it, is a false representation." *Duplissie v. Devino*, 96 Conn. App. 673, 681 (Conn. App. Ct. 2006). Accordingly, such a promise "may constitute actionable fraud if it is blended with a misrepresentation of a material fact and an evasion of the very promise, after the promisee has performed." *Id.* Shaffer did not present any evidence that at the time GET proposed the first salary reduction program and claimed it would only be temporary, GET knew the salary reduction would not be temporary. The minutes from the June 25, 2013 board meeting, which occurred just weeks before the first salary reduction program began, consistently stated the salary reduction would only be temporary. Pl.'s Ex. 92. Also, David Buicko, a GET board member, testified that "if the company got capitalized whether it's the Venezuela order or other business that we wanted . . . we wanted to make everybody whole." Trial Tr. 64. The Court has no reason to disbelieve Buicko's testimony or to suspect GET intended to not ever pay Shaffer his full salary when GET proposed the initial salary reduction program. Thus, Shaffer failed to prove the second element of fraud, as he did not establish GET's claim the salary reduction would only be temporary was known by GET to be untrue at the time.

Also, Shaffer did not present any evidence GET made a representation PDVSA had made an order at the time of the first salary reduction program. GET's board meeting minutes leading up to the first salary reduction program only stated there was an opportunity involving PDVSA, but no evidence indicates GET conveyed to Shaffer or any other employees that orders had actually been received or secured from PDVSA. Pl.'s Ex. 10; Pl.'s Ex. 92. PDVSA was never mentioned

in the email exchange in which Shaffer agreed to participate in the first salary reduction program. Pl.'s Ex. 9. Accordingly, there is not evidence GET made a false representation regarding PDVSA at this time. This means Shaffer failed to establish even the first element of fraud on this particular claim.

Further, Shaffer did not establish GET made any false representations about the company's financial status. Shaffer testified he was aware the company had a "cash flow issue" and understood this to be the reason GET made a request to its employees to take a temporary reduction in salary. Trial Tr. 81. Although Shaffer was not aware of the entire financial details of the company, his testimony demonstrates he was aware of GET's financial difficulties prior to choosing to participate in the first salary reduction program. Shaffer did not produce any evidence GET falsely represented its financial state to him or hid its financial condition from him. Indeed, GET's financial reports were public so anyone, including Shaffer, could have examined the financial health of the company. *See, e.g.*, Trial Tr. 27. Shaffer's testimony and evidence only establish Shaffer did not have complete insight into the company's financial difficulties, but he was generally aware of the strain on the company. He did not meet the high bar of proving the first element of fraud that GET made a false representation as a statement of fact here.

Finally, Shaffer did not establish GET committed fraud in allegedly not disclosing the litigation between Techtronic Industries North America, Inc. (TTI) and Iventek Colloidal Cleaners LLC (Iventek). TTI filed a complaint against Iventek on July 11, 2012 alleging Iventek breached its contract with TTI and had large overdue debts to TTI. *See Techtronic Industries North America, Inc. v. Iventek Colloidal Cleaners LLC* (D.N.J. July 11, 2013) (13-cv-4255), ECF No. 1. Iventek was a significant supplier for GET so Shaffer alleges the results of this lawsuit could have significantly impacted GET. Shaffer contends GET's failure to inform him about this suit was an

important omission that constituted a knowingly false representation made to induce him to participate in the first salary reduction program. However, Shaffer testified he was aware there was a suit between TTI and Iventek. Trial Tr. 82. Therefore, Shaffer did not present any evidence GET failed to disclose this litigation to him and that such an omission was made to induce him to participate in the salary reduction program by keeping him in the dark about the potential negative ramifications of that lawsuit for GET. Accordingly, Shaffer failed to prove GET committed fraud based on this allegation.

### 2. *GET did not commit fraud in inducing Shaffer to participate in the second salary reduction program*

Second, Shaffer contends GET committed fraud in inducing him to participate in the second salary reduction program. The second salary reduction program began on January 2, 2014. Shaffer alleges:

> GET's false representations include the representation that the salary reduction associated with Salary Reduction Program No. 2 was temporary. GET further made false representations that salary reductions would be paid to employees from payments by PDVSA although no orders had been received from or secured from PDVSA at the time of Salary Reduction Program No. 2. GET failed to disclose to SHAFFER the financial condition of GET, including the use of company funds to charter a private jet for travel by company executives, prior to SHAFFER's participation in Salary Reduction Program No. 2. Each of the foregoing representations and/or omissions of fact were untrue, known to be untrue by GET, made by GET to induce SHAFFER into participating in Salary Reduction Program No. 2, and SHAFFER did act upon such representations by participating in Salary Reduction Program No. 2.

ECF No. 66. Shaffer argues he was injured by participating in the salary reduction program because he did not receive his full compensation during this period.

GET again disputes Shaffer established fraud's fourth element. *See supra* Part II.D.1. GET claims Shaffer did not suffer any injury because he never lost his legal right to obtain full

compensation. Although the Court rejects this argument, Shaffer nonetheless failed to establish GET committed fraud.

As with Shaffer's fraud claim regarding the first salary reduction program, Shaffer did not establish GET had the present intention not to pay Shaffer his full salary once the company's financial health improved when it proposed the second salary reduction program. Shaffer did not present any evidence that at the time GET proposed the second salary reduction program and claimed it would only be temporary, GET knew the salary reduction would not be temporary. Buicko testified GET wanted to fully compensate its employees if the company had the financial resources to do so. *See* Trial Tr. 64. The Court has no reason to disbelieve Buicko's testimony or to suspect GET intended to not ever pay Shaffer his full salary when GET proposed the second salary reduction program. Thus, Shaffer failed to meet the second element of fraud, as he did not establish GET's claim the salary reduction would only be temporary was known by GET to be untrue at the time.

Further, Shaffer did not present any evidence GET made a representation PDVSA had made an order at the time of the second salary reduction program. Buicko testified there were not any PDVSA orders prior to 2015. Trial Tr. 41–42. There is not evidence GET made a false representation regarding PDVSA at this time. Thus, Shaffer failed to establish the first element of fraud that a false representation was made as a statement of fact on this particular claim.

In addition, Shaffer did not establish GET committed fraud by failing to disclose the company's financial condition, including the use of company funds to charter a private jet for travel by company executives for meetings with potential customers, prior to Shaffer's participation in the second salary reduction program. Shaffer testified he was aware the company had a "cash flow issue" and understood this to be the reason GET made a request to its employees

11

to take a temporary reduction in salary. Trial Tr. 81. Although Shaffer was not aware of the entire financial details of the company, his testimony demonstrates he was aware of GET's financial difficulties prior to choosing to participate in the second salary reduction program. Shaffer did not produce any evidence GET falsely represented its financial state to him or hid its financial condition from him. Indeed, GET's financial reports were public. Anyone, including Shaffer, could have examined the financial health of the company. *See, e.g.,* Trial Tr. 27. Shaffer's testimony and evidence only establish Shaffer did not have complete insight into the company's finances, but he was generally aware of the financial strain on the company. The Court does not believe additional information about the company's finances would have materially impacted Shaffer's already existing knowledge of the company's financial problems. Again, these difficulties were not hidden. Accordingly, Shaffer did not prove GET made a materially false representation so Shaffer did not establish GET committed fraud here.

3. *GET did not commit fraud in inducing Shaffer to participate in the third salary reduction program*

Third, Shaffer contends GET committed fraud in inducing him to participate in the third salary reduction program. The third salary reduction program began on May 14, 2014. Shaffer alleges:

> GET's false representations include the representation that the salary reduction associated with Salary Reduction Program No. 3 was temporary. GET failed to disclose to SHAFFER the financial condition of GET, the fact that GET terminated Marketiquette, Inc., and thus Jeffrey Loch, with instructions to wind down GET, or the products sold and delivered to PDVSA failed to contain "key ingredients" prior to SHAFFER's participation in Salary Reduction Program No. 3. Each of the foregoing representations and/or omissions of fact were untrue, known to be untrue by GET, made by GET to induce SHAFFER into participating in Salary Reduction Program No. 3, and SHAFFER did act upon such representations by participating in Salary Reduction Program No. 3.

ECF No. 66. Shaffer argues he was injured by participating in the salary reduction program because he did not receive his full compensation during this period.

GET again disputes Shaffer established fraud's fourth element. *See supra* Part II.D.1. GET claims Shaffer did not suffer any injury because he never lost his legal right to obtain full compensation. Although the Court rejects this argument, Shaffer nonetheless failed to establish GET committed fraud.

As with Shaffer's fraud claims regarding the first and second salary reduction programs, Shaffer did not establish GET had the present intention not to pay Shaffer his full salary once the company's financial health improved when it proposed the third salary reduction program. Shaffer did not present any evidence that at the time GET proposed the third salary reduction program and claimed it would only be temporary, GET knew the salary reduction would not be temporary. Thus, Shaffer failed to prove fraud here.

Once again, Shaffer did not established GET committed fraud by failing to disclose the company's financial condition. Shaffer's testimony demonstrates he was aware of GET's financial difficulties prior to choosing to participate in the third salary reduction program. For the reasons discussed in Parts II.D.1 and II.D.2, Shaffer did not met the high bar of proving fraud on this claim.

Further, Shaffer did not prove GET committed fraud in failing to disclose to Shaffer GET terminated its contract with Marketiquette prior to the third salary reduction program. GET provided notice to Marketiquette, Inc. on May 6, 2014 it was terminating their contract. GET and Marketiquette's agreement called for a one-year notification to terminate the contract so Marketiquette's relationship with GET was supposed to end in May 2015. GET informed Marketiquette it was terminating their relationship just eight days before Shaffer agreed to participate in the third salary reduction program, which occurred on May 14, 2014.

Marketiquette—not GET—employed Jeff Loch even though Loch was a GET board member and ran GET's operations on a day-to-day basis. Trial Tr. 33–38. Therefore, although Buicko testified Loch could have continued working for GET, at least as a board member, the fact Marketiquette, the company who paid Loch his compensation, was being terminated by GET very likely meant Loch would leave GET. Loch further stated the notification GET was terminating the contract with Marketiquette meant he was supposed to wind down GET's operations as a company. Buicko testified he did not know whether GET's employees were informed the contract with Marketiquette was terminated when they were asked to participate in the third salary reduction program, but he speculated GET's employees likely knew this information because GET was a small company. Trial Tr. 38. Regardless of whether Shaffer knew Marketiquette's contract was being terminated when he agreed to participate in the third salary reduction program, he did not establish this induced him to participate in this installment of the salary reduction program. At this point, Shaffer had been aware GET was under financial strain for several years. He had not received his full bonus in 2008 and had not received his full salary in any year since 2009 because of GET's financial problems. And GET's financial difficulties led to him participating in two previous salary reduction programs. It seems unsurprising these difficulties led GET to start terminating contractual relationships it could not afford. All employees and board members in this small company likely understood GET may not have been able to continue operating much longer under such conditions. The fact Shaffer may not have been completely aware GET was terminating its relationship with Marketiquette upon agreeing to participate in the final salary reduction program does not establish this omission induced him to participate in the program. The evidence in this case indicates Shaffer would have agreed to participate in the salary reduction program regardless. Thus, Shaffer did not establish GET committed fraud in regards to this claim.

14

Finally, Shaffer's allegation GET failed to disclose it delivered products to PDVSA that lacked key ingredients, which induced Shaffer into participating in the third salary reduction program that began on May 14, 2014 falters because the evidence indicates PDVSA did not make any purchases from GET until 2015. *See* Trial Tr. 41–42. Thus, any failure to disclose GET shipped PDVSA faulty products could not have occurred prior to Shaffer agreeing to participate in the third salary reduction program, as GET had not shipped any products to PDVSA at this time. Shaffer seems to actually be alleging GET failed to disclose it delivered products to PDVSA that lacked key ingredients when GET promised in May 2015 to make its employees, including Shaffer, "whole" once PDVSA paid for the products. *See* Pl.'s Ex. 25. Even if GET was hiding it shipped PDVSA products that lacked key ingredients when it promised Shaffer in 2015 it would pay his full compensation upon receiving payment from PDVSA, this could not possibly have induced Shaffer to participate in the salary reduction program that began in 2014—a year before GET made this statement.

Also, Shaffer did not even present sufficient evidence to establish GET delivered products to PDVSA that lacked key ingredients. The only admissible evidence Shaffer presented to support this allegation was an email from Jeff Loch, a former GET executive and board member, to David Buicko sent on June 16, 2017 implying GET shipped a faulty product to PDVSA. Pl.'s Ex. 37. Loch wrote:

> [Y]ou and I both know [the product sent to PDVSA] was different . . . You sent PDVSA a Provisional Patent that matched the samples that they were testing and certifying back in 2013 . . . however, the product you sent PDVSA appears to match the current Patent, but its description doesn't match what PDVSA thought they were receiving and describes ingredients never before disclosed or shared with them.

*Id.* However, Buicko testified PDVSA never indicated to him or anyone at GET the product GET shipped to PDVSA was not the same as the product PDVSA ordered. Trial Tr. 57. Buicko further

testified he has continued to be in correspondence with PDVSA in regards to a separate lawsuit between GET and PDVSA centered on GET trying to collect payment from PDVSA. Trial Tr. 59. The implication from Buicko's testimony he has continued to be in communication with PDVSA regarding the separate litigation, which centers on recovering payment from GET's sales to PDVSA, yet has never been informed by PDVSA the products were faulty, is that PDVSA has not raised this potential defense in that litigation. Overall, the Court cannot determine GET delivered faulty products to PDVSA based on this conflicting testimony and evidence. The Court found Buicko to be a credible witness. And the Court finds it perplexing PDVSA would never have informed GET the products GET shipped to it did not contain "key ingredients" if that was indeed the case, especially since GET has pursued legal action against PDVSA to collect payment for these products. Shaffer's claim GET failed to disclose its products delivered to PDVSA were not adequate falters because he did not present the Court with sufficient evidence to establish the products GET delivered to PDVSA actually had any issue with them. Thus, Shaffer failed to establish GET made any false representation about the products delivered to PDVSA. Accordingly, Shaffer failed to prove GET committed fraud.

### E.  Shaffer is not entitled to recover attorney's fees

Under Connecticut law, a prevailing litigant is typically not entitled to collect attorney's fees from the opposing party as part of his award. *Town of Brookefield v. Candlewood Shores Estates, Inc.*, 201 Conn. 1, 14–15 (Conn. 1986). There are certain exceptions to this general rule. These exceptions are primarily based on statutory or contract provisions that authorize a prevailing litigant to recovery attorney's fees. *Id.* at 14–15. State courts in Connecticut have also acknowledged attorney's fees may be recovered in situations where punitive damages are proper. *L.F. Pace & Sons, Inc. v. Travelers, Indem. Co.*, 9 Conn. App. 30, 48 (Conn. App. Ct. 1986).

16

Punitive damages may be recovered in breach of contract cases when the acts of a party constitute a tort, such as fraud. *Triangle Sheet Metal Works, Inc. v. Silver*, 154 Conn. 116, 127–28 (Conn. 1966). While no statute or provision in the July contract authorizes Shaffer to recover attorney's fees, Shaffer contends he is nonetheless entitled to attorney's fees because GET committed fraud in securing his participation in the salary reduction programs. However, Shaffer failed to establish GET committed fraud. *See supra* Part II.D. Therefore, Shaffer will not be awarded attorney's fees.

      F.    <u>Shaffer is entitled to prejudgment and post-judgment interest on his award</u>

Shaffer is entitled to prejudgment interest and post-judgment interest on his award. "In a diversity case, state law generally controls the award of interest." *Plantation Key Developers, Inc. v. Colonial Mortg. Co. of Indiana*, 589 F.2d 164, 170 (5th Cir. 1979). The Court therefore again turns to Connecticut law to determine the proper prejudgment and post-judgment interest rates because the contract had a valid choice-of-law clause, which stated Connecticut law controls. *See Home Life Ins. Co., New York v. Equitable Equip. Co.*, 694 F.2d 402, 404 (5th Cir. 1982).

Under Connecticut law, the award of interest is "primarily an equitable determination and a matter lying within the discretion of the trial court." *Bertozzi v. McCarthy*, 164 Conn. 463, 467 (Conn. 1973). Connecticut law states "interest at the rate of ten per cent a year, and no more, may be recovered and allowed in civil actions." Conn. Gen. Stat. § 37-3a (2019). This statute is generally understood to direct courts to compute the interest as simple interest. *Ne. Connecticut Econ. All., Inc. v. ATC P'ship*, No. X04-CV94-0124630-S, 2005 WL 3292122, at *3 (Conn. Super. Ct. Nov. 9, 2005).

Shaffer will be awarded prejudgment interest on his damages awards. Refusal to award prejudgment interest ignores the time value of money. GET concurs Shaffer is entitled to

prejudgment interest on the monies awarded by this Court. The Court will calculate prejudgment interest at a rate of ten percent.

The amount of prejudgment interest per day for the amount owed to Shaffer to pay the entirety of the 2008 bonus he is due, which is $50,000, is $13.69863. The calculation of prejudgment interest should date back to the date GET breached the contract by not fulfilling this aspect of the employment agreement. Shaffer should have been paid his full bonus by the end of 2008 so GET did not fulfill its contractual obligations when Shaffer was not paid in full by January 1, 2009. The Court will calculate prejudgment interest dating back to January 1, 2009, which was 3,819 days prior to the date of judgment, June 17, 2019. The prejudgment interest amount for this award totals $52,315.07.

The amount of prejudgment interest per day for the money Shaffer is entitled to recover as unpaid compensation for 2009, which is $14,688.20, is $4.024164. The calculation of prejudgment interest should date back to the date GET breached the contract by not paying Shaffer his full salary for 2009. Shaffer should have been paid his entire salary by the end of 2009 so GET did not fulfill its contractual obligations when Shaffer was not paid in full by January 1, 2010. The Court will calculate prejudgment interest dating back to January 1, 2010, which was 3,454 days prior to the date of judgment, June 17, 2019. The prejudgment interest amount for this award totals $13,899.46.

The amount of prejudgment interest per day for the money Shaffer is entitled to recover as unpaid compensation for 2010, which is $28,829.98, is $7.898625. The calculation of prejudgment interest should date back to the date GET breached the contract by not paying Shaffer his full salary for 2010. Shaffer should have been paid his entire salary by the end of 2010 so GET did not fulfill its contractual obligations when Shaffer was not paid in full by January 1, 2011. The Court

18

will calculate prejudgment interest dating back to January 1, 2011, which was 3,089 days prior to the date of judgment, June 17, 2019. The prejudgment interest amount for this award totals $24,398.85.

The amount of prejudgment interest per day for the money Shaffer is entitled to recover as unpaid compensation for 2011, which is $10,000, is $2.739726. The calculation of prejudgment interest should date back to the date GET breached the contract by not paying Shaffer his full salary for 2011. Shaffer should have been paid his entire salary by the end of 2011 so GET did not fulfill its contractual obligations when Shaffer was not paid in full by January 1, 2012. The Court will calculate prejudgment interest dating back to January 1, 2012, which was 2,724 days prior to the date of judgment, June 17, 2019. The prejudgment interest amount for this award totals $7,463.01.

The amount of prejudgment interest per day for the money Shaffer is entitled to recover as unpaid compensation for 2012, which is $2,884.63, is $0.79031. The calculation of prejudgment interest should date back to the date GET breached the contract by not paying Shaffer his full salary for 2012. Shaffer should have been paid his entire salary by the end of 2012 so GET did not fulfill its contractual obligations when Shaffer was not paid in full by January 1, 2013. The Court will calculate prejudgment interest dating back to January 1, 2013, which was 2,358 days prior to the date of judgment, June 17, 2019. The prejudgment interest amount for this award totals $1,863.55.

The amount of prejudgment interest per day for the money Shaffer is entitled to recover as unpaid compensation for 2013, which is $7,211.57, is $1.975773. The calculation of prejudgment interest should date back to the date GET breached the contract by not paying Shaffer his full salary for 2013. Shaffer should have been paid his entire salary by the end of 2013 so GET did not

fulfill its contractual obligations when Shaffer was not paid in full by January 1, 2014. The Court will calculate prejudgment interest dating back to January 1, 2014, which was 1,993 days prior to the date of judgment, June 17, 2019. The prejudgment interest amount for this award totals $3,937.71.

The amount of prejudgment interest per day for the money Shaffer is entitled to recover as unpaid compensation for 2014, which is $90,000, is $24.65753. The calculation of prejudgment interest should date back to the date GET breached the contract by not paying Shaffer his full salary for 2014. Shaffer should have been paid his entire salary by the end of 2014 so GET did not fulfill its contractual obligations when Shaffer was not paid in full by January 1, 2015. The Court will calculate prejudgment interest dating back to January 1, 2015, which was 1,628 days prior to the date of judgment, June 17, 2019. The prejudgment interest amount for this award totals $40,142.46.

The amount of prejudgment interest per day for the money Shaffer is entitled to recover as unpaid compensation for 2015, which is $35,000, is $9.589041. The calculation of prejudgment interest should date back to the date GET breached the contract by not paying Shaffer his salary for the five months he worked for GET. Shaffer should have been paid his entire salary for the time he worked for GET calculated on a pro rata basis at the time he was terminated on May 15, 2015, so GET did not fulfill its contractual obligations when Shaffer was not paid the full amount he was owed by May 16, 2015. The Court will calculate prejudgment interest dating back to May 16, 2015, which was 1,493 days prior to the date of judgment, June 17, 2019. The prejudgment interest amount for this award totals $14,316.44.

Shaffer is also entitled to post-judgment interest on his awards. Again, GET concurs Shaffer is entitled to post-judgment interest on the monies awarded by this Court. The Court will

calculate post-judgment interest at a rate of ten percent. Thus, Shaffer will be awarded post-judgment interest on his awards at a rate of ten percent per year from the date of this judgment, calculated as simple interest, until paid.

## III. Conclusion

The Court will award Shaffer damages on his breach of contract claim to fulfill the 2008 bonus and to account for his reduced salary in 2009–2015. Shaffer will also be awarded prejudgment interest on each of these damage awards and post-judgment interest on his awards at a rate of ten percent per year from the date of this judgment, calculated as simple interest, until paid. However, the Court will not award Shaffer severance pay or money for his unused vacation time. Finally, the Court will deny Shaffer's fraud claims. Thus, Shaffer is not entitled to recover attorney's fees. A separate order follows.

SIGNED this _17th_ day of June, 2019.

_____
Royce C. Lamberth
United States District Judge